Case No. 25-5269, HMO Louisiana, Inc. v. Department of Health and Human Services, NL. Mr. Werner, for the advance. Mr. Whitley, for the emblace. Good morning, Mr. Henderson. Good morning, Judge Henderson, and may it please the Court. Paul Werner, on behalf of Louisiana HMO. May I please reserve one minute for rebuttal. Our health care system is complicated. This case is not. The agency here simply refused to apply the plain text of its own binding technical note. And in doing so, it violated the APA in at least three different ways. Fundamentally, for this Court, this case is totally controlled by the PROPAC Pharma case. If you will recall, it was a 2004 decision written by Judge Tatel. And in that case, the Court considered the FDA's switch of its interpretation or understanding of the word use under the Orange Book. And there the Court decided that the FDA had not explained, and in failing to explain, it was the height of arbitrary and capricious decision-making. That goes here, too. The agency offered five words to explain its departure. It didn't explain. It offered five words of justification for departing from its own technical notes. It offered no explanation, and you're not going to hear any argument from government counsel today that is not a post hoc justification for that fundamental move. There's a very curious aspect of this case that is not addressed in your briefs, which is that the reason the agency did what it did, what you're challenging on appeal, is because you asked it to do that. So why is that not addressed in your briefs? We did address it, I believe, in a footnote in our brief. And I think what the Court should understand is the timeline and context here. Our client, prior to litigation, prior to engaging outside counsel, repeatedly requested information from the agency on how it calculated its scores, given the fundamental decrease in score year over year. The agency stonewalled. Then we sued. Then we engaged in settlement discussions with the agency and got behind the green curtain and had an understanding of what it actually did. Then we focused in on C05 and brought this particular challenge for its departure from the technical notes. That is the only measure that is at issue in our complaint before the Court. No, I understand that, but it just seems that what the agency did was exactly what you asked it to do. What we had asked it to do before we had any information, before our client had outside counsel, and in the context of trying to resolve this short of litigation when our client did not understand what the agency had actually done. Well, it seems that your client believed that the interpretation at issue before us was going to be favorable to it because it believed that the consumed contracts score was a 5. It was going to be really high and it was going to bring up the overall rating. But they were wrong about that. That doesn't mean that the methodology is wrong. No, it doesn't mean the methodology is wrong, but our client was making assumptions based on what it understood the agency had done before it actually did that. I understand that, but whatever the reason, it took a position about the methodology that appears consistent with what the regulations and the technical notes insist upon. So they were right about that. They were just wrong about factually how it would affect their score. It just seems from where I sit that you're just taking whatever position gives them a higher score as opposed to what's the correct way to interpret the regulations and the technical notes. They weren't actually wrong just about how factually it applied. They were also wrong legally. And ultimately, it doesn't matter even if our client asked the agency to do something. The agency is still duty-bound to actually articulate a reasonable justification for its change in policy. I understand that, but it's just very curious to me that you then come in here and say this is arbitrary and capricious and nobody could know what they were doing when you knew exactly what they were doing because they did what you asked them to do. We did not know what they were doing. We asked them to do something before we had known what they were doing. And once we understood it, once we got the data and understood how they calculated… Once you understood how it would affect your score, then you said the methodology is correct because it lowers your score. That's true. But it's exactly the methodology you asked for. But that's part of the iterative process as part of calculating the scores. And that is where we understood the agency went wrong. Now I understand. I think you're in a difficult position. But I just think it's – it just looks like it's a very results-oriented legal position because if your score were to be higher with this methodology, you'd be happy with it. But because your score is lower, you're challenging it. But then you're saying it's arbitrary and capricious when it's not because you asked for it. Well, that's true. But again… It didn't come out of the blue. It's what you asked for. It didn't come entirely out of the blue. But again, the timeline matters here when we ask what it did and how it did it and our understanding of… It only matters in terms of what your score ended up being. Yes, of course. And again, it's important to roll the camera back and understand the practical implications of the agency's ruling here. Those five words… …that you lose, and that's why you're here. Yes, we do. But those five words also matter. They impact the care of 34,000 different beneficiaries. I'm not sure I don't understand what you are perceiving to be the methodology because, you know, pursuant to Judge Pan's questioning here, you still end up with like a three-and-a-half score, regardless of the approaches that the agency took on the initial position and then what you've actually asked them to do. And then either way you go, when you weight other factors, that kind of also dilutes how the score will come out. Well, right. All we're asking for the agency to do is actually apply the technical notes that it itself adopted. And here that would make a change in the relevant C score. And the way the regulation works with respect to the technical notes is important for the court to understand. It's like if you're driving down the highway and a light on your dashboard pops up. You go look at the manual, and it says you need to change the oil. Then you go further in the manual, and you see how you're supposed to change the oil. That's the way the regulations work with the technical notes. You look at the regulation, it says calculate a score. The technical notes say how you're supposed to do that. If you go back to the car analogy, if you see you're supposed to change the oil with 30-weight oil, you don't go back and say, well, it just says change the oil so I can use milk and honey or whatever else I want to put down there. You change the oil with oil. Let's talk about that. So if you've got H. Molo's position regarding what happened to H. 5576, was it a consumed contract in consolidation, or was it a terminated contract? It was consumed, which means it ends, which means it's terminated. Again, this semantic – But consumed and termination seem to be different. No, they're the same. If you look at common usage, a contract that ends is, in fact, terminated. There's nothing in the regulations. Termination is defined. Yes, it's defined. It is not defined. Termination is not. Or this is what, 42 CFR 422.508, mutual consent, or if a CMS determines the MA organization has neglected its duties, or by the MA organization, if CMS fails to substantially carry out the terms of a contract. It's defined. It doesn't include consumed. It says those are ways that a contract may be terminated. It's not exclusive, and a consumed contract is terminated because it ends. Consumed equals terminated makes no sense with the way you're supposed to calculate the score. It has to be a weighted average with the consumed contract, which means it's not terminated. This is a position that the agency itself never offered in its decision. It would be improper for the court to go down the semantic rabbit hole. But how consistent with that aspect of the regulation? There's nothing – The regulations say when you calculate the score of a consolidated contract, you take the weighted average of the consumed and the surviving, the two prior ones. And if the consumed were always terminated, you could never have this formula. If you look at JA 267 and also 194 and 195, it says you take all the contracts and then you look at whether any are excluded. The plain language of the exclusion says you take out contracts with an end date. You're not answering my question. How is that consistent with the normal formula for calculating the score? It's an exception. It is an exception to the normal formula. But if you ever use the consumed, then it's not terminated. That is the way the technical notes properly work. That is the plain language of the technical notes that the agency itself wrote. And you're not answering my question. I am. I'm trying to. So here's the question. The question is, if the standard formula for calculating the overall score after two contracts are consolidated requires a weighted average of the surviving contract and the consumed contract, how is it possible that the consumed contract is ever terminated? Because you're always the default, the norm, is to average in the consumed contract score. You would take that out because the data is not reliable. That's what the exclusions are for. So you're saying this formula is wrong? No, the formula works the way it works. How does it ever work if the consumed contract is always terminated? For this particular measure, you would always take it out. So only for CO5. All of the notes are different. They have different exclusions. Every single measure is unique, and it's based on the service that's being measured. But why is your interpretation the best interpretation when it conflicts in this way, when the most normal and natural reading would be that consumed is not equal terminated? I don't agree that it conflicts in any way. Well, should we try to read this to reconcile all the different regulations and notes? Actually, what this court should do is look to what the agency actually did and evaluate that, and it hasn't offered any justification. That's what we're doing, but shouldn't the correct interpretation of what they did and whether it's correct or not depend on reconciling these different regulations and rules? Of course, they all fit together. So why is it not that their interpretation reconciles it and yours does not? They don't have any interpretation. What they have are post hoc rationalizations. The agency didn't offer any interpretation along those lines at all. Well, why would the technical notes require CMS to consider data prior to June 2015? I mean June 15. I'm sorry. Why would the technical notes require CMS to consider data prior to June 15? It would not. That's the data that's supposed to be excluded because it can't be validated. The reason for the exclusions, it looks at plans with certain few enrollees and also data that isn't reliable. That's what gets excluded. Those are why those particular contracts that are terminated or end are excluded because the data is invalid and it will lead to an improper score. Well, why is it invalid and why is it improper? The new contract has the CO5 provision, so doesn't the consumer want to know the basis or the quality of that contract? No. This is another mistaken argument that the government is now advancing on the appeal. You look for the data for the measurement year. The measurement year is 2003. Okay, so is it correct? I understand, but that's true for all of the ratings. True. So isn't it true that the new consolidated surviving contract, whatever you want to call it, the new contract that combines the two, does offer the S&P, that is the CO5 term? Does it offer it or not? Yes or no? I want to be clear. Yes or no? Does it offer it or not? It will offer it in 2025. It did not offer it during the measuring year. The measuring year was 2023. I understand that, but you're obfuscating. No, I'm answering you directly.  The 2025 ratings always reflect 2023 data. Yes. It's not just this particular case. Right. So the 2025 rating for this S&P, which has it for this new contract that has an S&P, should reflect the 2023 rating for the S&P that's being offered. Yes, that's true. Which includes the consumed contract. No, it doesn't. You are offering the data for measuring year 2023. The go forward, the surviving contract in measuring year 2023 did not offer the S&P. The point is if you were – But the consumed one did. And they're combined, and the 2025 one reflects both the consumed and the surviving. No, that's not the way – No, it doesn't? That is not the way the technical notes actually work. No, no. Tell me how this works then. The surviving – the consolidated contract for 2025 combines the surviving and the consumed contract. Right. One of them had this S&P feature. The other one did not. Why should the 2025 one not include the rating for the one that did? Because the 2025 plan is offering something new. The surviving contract did not have the S&P, and the terminated contract was, in fact, terminated. And based on the way the technical notes work, you are to exclude that. But, again, we're having a discussion around a rationale that was never put forward by the agency itself. The APA requires the agency to come forward with the rationale, not for the district court or this court to backfill an explanation the agency itself never offered. It does start out with different definitions of termination, and the regs identify all three types. You can have modification or termination of a contract by mutual consent. It can reference termination of a contract with CMS or discuss its termination by the MA plan. Isn't that an exhaustive list? It is not because it says those are the ways a contract may terminate. It says nothing about how that relates to consumed contracts in a consolidation process. And if you look at the regulation itself, consumed contract means a contract that will no longer exist. In common, everyday language, that means the contract has been terminated. I'm way out of time, and I'm happy to continue to answer questions. We'll give you a couple minutes. Thank you. Mr. Whitley? Good morning, and may it please the Court. Special Assistant United States Attorney Kenneth Whitley on behalf of the government. The district court correctly granted summary judgment in CMS's favor. CMS's regulations are simple. CMS evaluates consolidated contracts on Measure C05 for the second year after consolidation if either the consumed or surviving contract offers special needs plans in the measurement year and the consolidated contract is offering a special needs plan in the star ratings year. HMOLA's consolidated contract offered special needs plans in 2025, and its consumed contract offered special needs plans in 2023. CMS properly evaluated the consolidated contract on Measure C05 for the 2025 star ratings period. Let me just ask a basic question. How is this data received and performed? Is it all digital, electronic, or by humans? For the Measure C05 and Measure D11, the two measures that are predicated on Medicare Part C and D reported data, that data is reported through CMS's computer system. Okay. The reason I ask is because CMS's initial position, there is a suggestion that there was a computer glitch early on? Yes, Your Honor. For some reason, HMOLA was unable to submit its special needs plan data for its consumed contract through the computer system. That was a one-off error that has, to CMS's understanding, never happened before. Indeed, in 2024, CMS evaluated. Do you consider that data just not counted because of the computer glitch, or do you consider the contract terminated? When CMS learned of the computer glitch and HMOLA's inability to submit data, it permitted HMOLA to submit its data so that CMS could consider it in accordance with its regulations. The rule that HMOLA is advocating is that the surviving contract must be the one offering special needs plans in the measurement year, but there's no support in CMS's regulations for that position. HMOLA's contract consolidated on January 1, 2024. For the first year after consolidation, CMS considered, like I said, the special needs plan for HMOLA's consolidated contract. When CMS failed to do the same for the second year following consolidation, HMOLA alerted CMS to the issue, and CMS considered the special needs plan data for the second year. Let's go back to just consolidated and that termination. If you consolidate a contract, is there any kind of contemporaneous termination with that? No, Your Honor. A contract consolidation and a contract termination are two completely distinct and separate events. When a contract terminates, it ceases to exist. A terminated contract will not receive a star rating for the following year. If the contract terminates, its plans terminate. Under CMS's regulations — So none of that data is considered in the formula for the termination. If a contract terminates, it will not receive star ratings, published star ratings, for the next year. CMS may consider data after that June 15, 2025 date in the guidance, just for its own administrative purposes, but not for purposes of calculating a star rating. And then I mentioned earlier that there were three forms of termination. Do you think it goes beyond that? I'm sorry, could you repeat that? I mentioned earlier to your opposing counsel about the regulation technical notes about three types of termination. Can it go beyond that just by the use of the word may? Have you all expressed that in any other way? No, Your Honor. Section 422.508, 510, and 512 list the exclusive ways contracts are terminated. CMS's consolidation regulations speak clearly to this scenario. CMS's rules stand for the proposition that contracts be evaluated on the performance of the plans that they offer. HMOLA's consolidated contract offered special needs plans in 2025, and its consumed contract offered a special needs plan in 2023. CMS correctly evaluated HMOLA's consolidated contract on Measure C05. What do you understand that your opposing counsel would need to have you calculate in terms of a formula to get to its four-star rating or above? The only way HMOLA can reach a four-star rating is if CMS does not consider the special needs plan data for Measure C05, but it does consider the data for Measure D11. I raise Measure D11 because it includes the same exclusion in guidance as Measure C05. CMS has treated those two measures the same. Oh, are you saying that there's another aspect, D11, where they accept the methodology, whereas in this one they don't? That's right. So if you had to recalculate this one, wouldn't you have to recalculate D11? Yes, Your Honor. The only way HMOLA can reach that four-star rating is if CMS only calculates C05 by not using the special needs plan data for its consumed contract, but it uses the data for the consumed contract for the D11 measure. And if you take out the consumed data for the D11 measure, will their rating fall? CMS calculated this initially by not including the special needs plan data for C11 or, I'm sorry, C05 and D11, and their contract score was 3.749, grounded down. By including both, and that was the approach that HMOLA advocated to CMS, their score was 3.60. So it went down. It went down. The only way it will go up— So did D11 go up and C05 go down? I was wondering if— Their D11 measure score did go up, yes. Okay. Okay, so they only want this interpretation if it helps them, but if it hurts them, they don't want this interpretation. That is correct, Your Honor. This litigation is HMOLA's effort to cherry-pick the measure scores that it wants. And if the correct methodology is the one that they want and you recalculate the D11 score, do they still get to 4.0 or not? Your Honor, that would be consistent with the approach CMS erroneously took the first time, and their measure score would be 3.749, which would round down to 3.5. So it's still 3.5. Yes, Your Honor. So they can't get out of 3.5 with a consistent application? Yes, Your Honor. That's exactly right. That's exactly right, Your Honor. Okay. I welcome further questions from the Court. All right. Thank you. We ask that you affirm the District Court. Okay. So let me start with D11, which, of course, isn't in this case. But D11 was offered, a measure that was offered by the surviving contract as well as the consumed contract. So the application, it's not the same issue. But there's nothing in the record in this case that warrants going into the measure. So, Counsel, I understand you're in a little bit of a difficult position because you're trying to achieve the highest score for your client. But just from the point of view of a court of law, we're trying to analyze and interpret provisions that are in regulations and in technical notes. And it just seems difficult for us to accept that you really believe that this is the correct interpretation or the best interpretation when it seems so driven by the results and not by just achieving the correct interpretation. Because if it benefits you, then you want whatever that interpretation is. And it's not even consistent across different types of, I don't know what you call those. There is nothing in the record to support that. D11 is not an issue here. I can represent to you that we are not asking for a different application. Let me tell you what I see as supporting that. What I see as supporting that is you took the completely opposite position before the commission until you realized it hurt your score. And then so you changed your position. And then you come and ask for this position because you think it increases your score. But if this methodology that you are asking for were applied consistently across C05 and C11, it seems like that wouldn't change your score. So you only want it applied as to C05. I'm just saying what it looks like to me.  And this is why it puts you in a difficult position because then you lose some credibility. It doesn't sound like you're trying to assist us in finding the best interpretation. It seems like you just want whatever interpretation will give you a higher score. Well, that's the whole point of the iterative process with the agency is to evaluate, to get to the right score, to get to a score that is a true reflection of the plan's quality so that enrollees have accurate information about the plan when they're selecting and choosing which plan to enroll in. So it is a process to get to the right score. But in terms of what we are advocating here and the change in position, the change in position came after we were able to get behind the green curtain and see how the agency was actually using the data. And we are not advocating for a different application for C and D. Those measures are different. The exclusions are different. And D actually had a surviving contract as well. And if you look, again, if you look at the agency's – Do you think the difference between C and D is just that whatever the provision is, one was in the consumed contract and the other was in the surviving contract? They are different. But more fundamentally, if you – That's not the way the formula works. It's a weighted average of both. Except if you exclude certain data under the technical notes, which are binding. The agency has conceded they are binding. If the court looks at what the agency has actually done, and the initial determination is at 367, where the agency actually offers an explanation for why a consumed contract is, in fact, to be treated as a terminated contract, to the point where the computer system that the government uses to manage healthcare data rejects the data, and then you compare that to its completely different position articulated in one line at 375, there is no explanation for that change in position. And whether we advocated something differently or not, an agency decision rises and falls on the agency's explanation that it actually offers. There is no explanation from this agency, other than post hoc rationalizations, including discussion of things that actually aren't even in the record that this court has before it. All right. Thank you.
judges: Henderson; Childs; Pan